Benjamin M. **GALLO**

v.

**HOWARD STORES CORPORATION.**

Civ. A. No. 16407.

United States District Court
E. D. Pennsylvania.

Oct. 16, 1956.

**910**

Stark & Goldstein, Philadelphia, Pa., for plaintiff.

Daniel Mungall, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

The plaintiff, a former employee of the defendant, brought this action to enforce his asserted rights under an employees' pension plan in which he was a partici-pant. The complaint asks, among other things, for a money judgment for pension benefits accruing since he left the defendant's employ in November 1952. That phase of the case was tried to the Court with a jury. In a special verdict, the jury answered interrogatories dealing with the issue of liability only and the issue of damages was, by stipulation, submitted to the Court to be determined later without a jury. The plaintiff now moves for judgment in his favor on the verdict and for relief by way of mandatory injunction. The defendant moves to set aside the verdict and for judgment in its favor.

There is very little, if any, dispute about the essential facts of the case. In December 1950, the plaintiff, having been given, by the defendant, to understand that it had adopted a pension plan, signed a card applying for participation in the plan. The card bore the heading "Continental Assurance Company. Group Annuity Plan Application and Payroll Deduction Card" and read in part as follows:

> "I hereby apply for participation in the Retirement Plan for which I am or may become eligible under the Group Annuity Contract issued to my Employer by the Continental Assurance Company. I agree to the deduction from my wages of such contributions as may be required of me under the Plan."

At about the same time the defendant entered into a contract with Continental Assurance Company, setting up the pension plan. This contract was not merely an underwriting or guarantee by Continental of an obligation of the defendant to its employees. It was a direct assumption of liability by Continental for the carrying out of various phases of the plan, including the payment of pension benefits to the employees.

Thereafter, the defendant, under the authorization contained in the card, deducted $.57 each week from the plaintiff's wages and continued to do so until he left its employ. The plaintiff, of course,

had not seen and, as a matter of fact, never did see the "master" contract between the defendant and Continental.

On June 13, 1952, the defendant distributed to its employees a booklet accompanied by a letter. The letter advised the employees that the pension plan, in effect since December 1, 1950, had been approved by the Internal Revenue Department and went on to say, "we are pleased to enclose a booklet which describes in question and answer form your Pension Plan. We have attempted to take a pension plan with its legal complications and reduce it to a form which all of us as laymen could easily understand." The booklet was simply a series of questions and answers which covered most of the features of the plan in which an employee would be interested.

There was, however, one omission out of which this lawsuit grew. The booklet referred to "normal" retirement at age 65 and then said, "Early retirement can take place at any time after a Participant reaches 55 years of age provided that he then has at least 15 years service." It failed, however, to say anything about the clause in the master contract which provided that an employee could get the benefit of an early retirement only if he retired with the consent of the employer. Although the booklet gave precise figures as to benefits upon normal retirement, it did not state what amounts would be paid upon early retirement.

On November 7, 1952, the plaintiff's wife delivered to the defendant a letter stating that the plaintiff intended to exercise his right under the plan to retire early, on November 20 next. On the day this letter was delivered, the plaintiff's boss requested him, as a favor, to stay on the job until November 26, which the plaintiff agreed to do. He was at work on November 20. On that day there was delivered to his house a letter from the defendant informing him that, under the plan, early retirement depended upon the consent of the employer and asking for information as to the plaintiff's age, circumstances and plans. The plaintiff continued to work until November 26, at which time he left the defendant's employ permanently.

The interrogatories submitted to the jury and their answers were as follows:

"1. Would an employee of Howard Stores of ordinary carefulness and intelligence have regarded the booklet, Plaintiff's Exhibit 1, as the contract between Howard Stores and himself? Answer: Yes.

"2. When Mr. Gallo left the employ of Howard Stores did he believe that he was entitled to a pension under the Early Retirement sentence in the booklet, Plaintiff's Exhibit 1? Answer: Yes.

"3. If your answer to Question No. 2 is "Yes", was he justified in such belief? Answer: Yes."

The plaintiff bases his case upon two alternative theories.

### 1. Contract

The exact relationship among an insurance company, an employer and an employee, created by such a pension plan as was agreed to here, is an extremely difficult one to classify. The employer and the insurance company agree with each other upon the terms of the plan which is, in effect, an annuity contract under which the annuity is to be paid to the employee upon certain conditions, the employer agreeing to pay a part of the consideration, but each employee as he becomes a participant agreeing, in effect, to pay a portion of it. Such arrangement is a tripartite contract by which each party agrees with each of the others to perform certain acts, so that the insurance company, if it fails to pay the annuity is not only breaching its contract with the employer but also its contract with the employee.

Such tripartite view of the contract would seem to be more nearly in accordance with the intentions of the parties

than other views which might be taken. For instance, it would be contrary to the facts to hold that the employer agreed with its employees to pay pensions to them and merely guarantee these payments through its contract with the insurance company. The language of the application card and of the policy excludes this view. This employer, apparently for business reasons, deemed it inadvisable to enter into such agreement with its employees but rather chose to procure for them a direct obligation from the Continental Assurance Company which both it and its employees would pay for.

It is also difficult logically to view this transaction as a contract between the employer and the insurance company wherein the employees were merely third-party beneficiaries. At least, to refer to them as such is misleading. They applied to the insurance company, not the employer, for their rights under the plan and agreed with it that payroll deductions could be made.

■ Obviously, when the defendant delivered to the plaintiff the booklet which, inadvertently, told him that he was entitled to early retirement as of right, it had no intention of altering the contract and, in fact, the plaintiff does not suggest that it did. However, a party may be bound by his words or conduct, without any intention to assume legal obligation if the words or conduct are such that a reasonable man of ordinary carefulness and intelligence would understand that such was his intention. This was the basis of the first interrogatory which the jury answered "Yes".

■ In my opinion, the interrogatory should not have been submitted or, if submitted, the jury should have been directed to answer "No", because, under the undisputed testimony, no reasonable man in the plaintiff's position could have understood that the defendant intended by the booklet to alter or change the master contract which governed the pension plan. A reasonable man in the

plaintiff's position, having signed the application card of December 1950, would know that there was a contract in existence to which the defendant and Continental were parties and to which he had subscribed. Not only had he subscribed to it but by so doing he had authorized his employer and Continental to contract for him and had adopted the contract which they made. When he got the booklet, he would know that the pension plan had been in existence for over a year and a half. On reading the booklet, he would be at once advised that it, together with the accompanying letter, purported to be an explanation of an existing plan or contract without any suggestion or announcement of a change. The evidence simply will not allow for a finding that the defendant had abandoned the original agreement among itself, its employees and Continental and substituted for it an agreement between itself and its employees. The answer of the jury to the first interrogatory, which necessarily involved a finding that the distribution of the booklet and subsequent payments made by the employee thereafter established a new contract between the employer and the employee, cannot under the undisputed evidence be sustained.

## 2. Estoppel

■ The plaintiff argues that, if the booklet did not create any obligation of a contractual nature on the part of the defendant, then the defendant is estopped from setting up as a bar to the plaintiff's recovery the provision of the contract with the insurance company requiring the employer's consent before an employee could take advantage of the early retirement provision.

The principles of equitable estoppel, or estoppel in pais, are too well settled to need elaboration here. Unquestionably the booklet, in omitting reference to the necessity of company consent, amounted to a misrepresentation (although entirely innocent) upon which the plaintiff could justifiably rely, and

the jury found that when he left the employ of Howard Stores, he believed that he was entitled to a pension in accordance with the incorrect version of his rights given in the booklet.

The question remains whether he did, in reliance upon the booklet, surrender any rights or incur any detriment or alter his position to his prejudice. Although the evidence was to the effect that he could have stayed in the defendant's employ or could have had his job back if he had applied for it shortly after leaving, it may be assumed for the purposes of the discussion that when he left the employ of the defendant he altered his position to his detriment. The plain fact is that when he left his job he knew that the defendant was not going to allow him the benefit of early retirement without its consent. I think the plaintiff makes the mistake of assuming that, when he wrote his letter of November 7 announcing his intention to quit, he had taken final action. The fact is that his act in quitting, not his writing the letter of November 7, was the thing which actually severed his connection with the company, and it could not be that he quit in reliance on a supposed promise which had been plainly and unequivocally withdrawn. Consequently, there would be no issue of fact that could properly be submitted to a jury as to his reliance, and the plaintiff cannot recover on the theory of estoppel.

On a third alternative theory based neither on contract nor estoppel but upon tortious misrepresentation, the plaintiff might be entitled to recover the amount of money deducted from his weekly pay between June 13 and the date when he quit, November 26, at 6% interest. He has not asked for this, however. In any event he is entitled to the return of the deductions, by the terms of his contract.

An order may be submitted in accordance with the conclusions of the foregoing opinion.